22-50158, B.W. v. Austin Independent School District. Good morning, Your Honor. Good morning. Thank you for letting me be here today. I've been before this court many, many times. I haven't been before the entire panel and bunk, so I'm kind of getting myself used to almost like a basketball court, kind of looking back and forth and getting myself set. Thanks again for letting us be here today, counsel. We're here on behalf of a student at the Austin Independent School District, initial B.W. v. Austin Independent School District. In the United States of America, pursuant to the First Amendment of our Constitution, we have freedom of speech. We also have, with that freedom, many others that come along with it. One is the freedom to hate. We have that, too, but what we don't have is the freedom to hurt. Now Congress, in its wisdom, has promulgated a number of statutes to help us draw that line between speech and hurt and hate. One has to do with disability discrimination, 504 of the Rehabilitation Act of 1973. One has to deal with bullying, harassment, hostile environment under Title IX, dealing with sex discrimination. And here, we're here today to talk about discrimination based upon race, pursuant to the Civil Rights Act of 1964. But it is not about political hurt. If I was voting for A, and you were voting for B, and we were arguing about that, that would not be under Title VI. That's correct. Okay. And that's what this case is about. Well, respectfully, that's why we're here to disagree. I mean, wasn't your own complaint, didn't it say the very first time that he had a problem was when he wore the MAGA hat, which is not a racial matter. And I'm not saying people should discriminate against someone who supports Trump or who supports Biden or who supports anyone else, but that is not a Title VI violation. Now, let me go through a number of facts in the case to help hopefully prove otherwise. Few years ago, in fact, we were at a program in Dallas before COVID, and I think you were there, and Judge Ho was there, and Justice Ho, and he said he reads the last document before he comes to these types of programs. And today, I'm going to submit to you that we need to read the first document, which is the complaint, the live complaint. So I'm going to go through the live complaint, because this case has been adjudicated on a 12B6 motion to dismiss. The issue is, does the complaint satisfy the requirements of Rule 8? Do the facts in the complaint get us beyond mere speculation that the allegations are plausible? Okay. So that's all we have today. I mean, the complaint does mention a couple times of saying white, but it is so limited and so spread out. How can you say that that's the problem, particularly since most of it was about his political views and fighting with him over that? And a few were over him, in their view, being, he being a racist in their view. And I'm not, again, trying to criticize BW. I'm just saying that is what the people were criticizing. Let me use an image for a moment that I think we're all familiar with. Sometimes there's a rain, and the rain just clears the air, and you wake up the next morning, and it's fresh and sunny. It's a new day.  I submit to you that what the students experienced at school was of the second type. Fixating on incidents, disaggregating the claims, loses the full impact of what that young man and other children who were bullied and harassed at school experienced. Counsel, were you going to tell us about the facts in the complaint? I am. Thank you, Your Honor. So, early on in the spring, we note in our complaint that a broader stereotype began to evolve, where it began to change at school for him. No longer was he bullied and harassed because of his politics, because he wore a MAGA hat, because he was outspoken about the Second Amendment, or things like that. He began to get bullied because of his race. Part one. He's in class, and students are all the time talking to him about the evils of the white race in American history. The principal, in front of everybody, asks him if he's listening to Dixie. And by the way, that's another important part of a 12b6 motion to dismiss, is the inferences that occur in the case. You know, I started writing in some of my briefs, inferences, because inferences are really what carries us on human life, and in the legal life, more importantly. So when the principal starts making— Well, are you denying that there have been some issues in American history with some white people? Are you denying that? I'm sorry. I'm not understanding that question, Your Honor. Say that again. Well, you said that they were talking about American history and stuff like that, and that's in your complaint. And again, there have been some wonderful white people in American history, but there have also been some problems with slavery, et cetera. Is that not something that can be discussed in school? Absolutely has to be. That was in band class. That wasn't in debate. That wasn't in history. Counsel, what if a student is in a band class, and the student is black, and a bunch of students gang up on the student and start yelling at him about the evils of the black race in American history? Do you think that's a racist allegation? Absolutely. In fact, I've been before this Court very recently on two other cases dealing with race-based issues, the Sneed case and the Bauble case, which counsel cites today. So we're here—this is another kind of short thing I want to pepper in here. We're here not just because of B.W. We're living in a divisive time. We have another election coming upon us. Even counsel brings this up in his public policy statement. Well, what do you want? You want this Court to make a declaration of sorts? Is that what you're seeking? I want the Court to follow the law regarding 12B6 motions and Rule 8 that says if you plead facts that are plausible, then you win. What's the relief you're seeking? Your complaint is— Let me go set the facts. Listen to me. Listen to my question first— I'm sorry, Your Honor. —before you start to answer. Your complaint alleges a variety of matters, some with respect to students, some with respect to, you know, administrators in the school, you know, above the time frames, et cetera. You sued the school district, and you have a lot of claims in there about what the district didn't do. So bottom line, before getting there, I see what your final prayer—is this a money damages case against the school district for its failure to do X, Y, and Z? Is that, at bottom, where the 12B6 emphasis you're asking should go? Yes. Okay. Counsel, if you were going through your complaint, are you saying that the complaint points out that what began as a political one then pivoted and became a racial one, or is your argument that the complaint says throughout it was a mixed motive case? It was politics predominantly, but also harassment based on race. Well, as far as the facts pled, we know both types of angst the young man experienced were both there, political and racial. But—and I do want to go through the facts—is that very, very much it was racial. So it's a mixed— I think you're saying it's mixed motive, unprotected politics, but also race. And I guess my question to you is, what's your best case that shows sufficient incidents over a year that are based on race, equal frequency, equal pervasiveness? What's your best case that, by my count, let's say maximum six per year, using the word whitey, is—do you have a case that says that's not isolated? Yeah, the first case that the Supreme Court dealt with on this issue was Davis versus the Monroe School District. That young man harassed that young girl six times within a five-month period. Our young man here was harassed daily over the course of many years by a number of students and 11 educators. Daily in terms of race or daily in terms of politics and race? Race. Let me go through my facts, if I may, because I wanted to talk about that. So forgive me if I jump back into that. So he's in the class. They talk about the evils of the white race in American history. The principal talks about listening to Dixie. One teacher in front of everybody says she's concerned about the number of white people that are here. Another teacher in math says in front of everybody, calls him whitey, you need help, whitey. I mean, come on, that's not hostile? My kid, I'd be outraged. But he didn't— Counselor, I think the question, though, was, aren't we talking about a two-and-a-half-year period? Yes. All right, so you've named, what, three incidents now connected to race? I guess, let me keep going because to me, if you're talking about two-and-a-half years, which the defendant brought up and even the panel brought up, to me, that shows pervasiveness, actually. If this were a case about a noose in some kid's locker and they kept putting the noose back up again and a 12B6 is filed, would we reject that case proceeding further simply because the plaintiff said the noose was put up and it stayed there for a long time instead of saying the noose was there on such-and-such a date and such-and-such a date and such-and-such a date? Because I think your complaint is rife with saying, and this went on and on and on. Well, actually, one of the cases before you a while back was a Snead case against IASD and when a noose was hung up, the kid said it was because it's Halloween. We said, no, you put up a noose, it's about race. So where's to take the inferences if they could be read in a neutral way or they could be read in a hostile way for race? At this 12B6 stage, does our case law in this circuit say we must construe the inferences as plausible in favor of the plaintiff's case at the 12B6 stage? If they could be taken either way. That's absolutely correct, Your Honor. In baseball largon, the tie goes to the runner and we're the runner. Can you be a little louder? Put your microphone closer. I'm sorry. If there's any uncertainty, the inferences go to our benefit, not the school district's benefit. Another big issue, of course, is when the student council president created a meme of him as a Ku Klux Klansman. I think that speaks very clearly that was meant to be racial. Well, if somebody is in the Ku Klux Klan and you're criticizing them, is that you being a racist or them being a racist for being in the KKK? Because the KKK is a racist entity. Well, the issue, the issue, you know, now we're not at a motion for summary judgment once again. We're at a motion to dismiss stage. I'm sorry. Is your client a member of the Klan? Come again, Your Honor? Is your client a member of the KKK? Is your client a member of the Klan? What? Is your client a member of the Klan? No. Hold on. Hold on. Hold on. Hold on. Is the allegation that your client is a member of the Klan something you're entitled to a fact trial on, so that you could dispute that allegation that I've heard? That's quite an allegation. We wrote in the introduction about who he is and his family, who happens to be artists. In fact, his dad's a musician and have Jewish members in the family, so no, he's not a Klansman. And I'm not saying he is, but what I'm saying is that is different from simply race. That is racist to be in the KKK. What we're saying is that if I'm at school and one part of the story is somebody says, Marty, you're in the Ku Klux Klan and I'm not, they're saying that I'm a racist and I'm not. And that's what the— And being—accusing someone of being a racist is different from yourself being a racist. I mean, that—those are different issues. I would agree. Racism—disputing about whether someone themselves is a racist, to me, is very different from saying you're in this race, so I don't like you. Part of the story is not just being called a racist, which by itself has context, whether you are or you aren't. You don't call black people racists. But it has to be with the context of what happens over the course of a number of years with students and teachers. So last we left off— Is calling someone a racist actionable under Title VI? Say that again, please. Is your argument that calling someone a racist is actionable under Title VI? Is that your argument? By itself? No. How about saying, if you're white, you must be in the Klan? Would that be racist? If you're what? If you're white, you must be in the Klan, or you're in the Klan because you're white. Well, that would be stereotypical, and by itself, it may or may not be. But if it's done over the course of two and a half years by eleven teachers—eleven teachers. We're talking about a hostile educational environment here. We're not just talking about racism. We're not just talking about Title VI. We're talking about a hostile educational environment for students. So the answer is, in context, yeah, it's racist. Counsel, does your complaint—is it correct that your complaint says that the student was physically assaulted because of his race? Yes. That the person said, I assaulted him because he was white. Yes. And then his friends proceeded to trip this young man every time they saw him. Yes. You know, the one thing— I guess, I just want to make sure I'm straight on the record. Did the student who assaulted your client say directly to him that he was assaulting him because of his race, or was this some third-party rumor that was going around the school? Well, the way we pled it is that—now, of course, whether it's hearsay or not, it's not really relevant in the 12v6 motion. But the short answer is, I don't know. But the way we pled it was he heard it from others. He heard that that was the reason given, and they persisted in tripping him after he complained about it. The young man bragged about it. He did it because he was white. Counsel, you mentioned that the student was harassed by 11 teachers. Yes. Where in your complaint do you plead teacher-on-student harassment? We do that—I can give you the report of record numbers. It's right here. These are all the—page 430—it's all from the complaint, Your Honor. From the American— Do you need to plead teacher-student harassment in order to have the environment for the student being harassed? Do you need to specifically plead a separate claim for teacher harassment? Once again, from the 12v6 motion and Rule 8, we just have to put them on notice. We put them on notice that the young man was being bullied and harassed because of race, because of teachers, and staff. So the answer is, it includes that. So, yes. They're both included. The incidents? Yes. Yeah, so—boy, I haven't even gone through that. You had a state law claim. Is it still out there? No, that's all gone. All right. So it's just this— Alliation's gone. I'm sorry, Your Honor. No, no. You were answering my question. You said the state law—I know you had a state law claim. It's gone, and you pulled back on the retaliation. So it's just the Title VI claim that's before us. Is that right? We have, Your Honor. And let me scoot through this in the last minute and a half, and then we'll pick up the rest in my last 10 minutes. Students call him a racist, why you're a racist, effing racist. A teacher says I will not have a white man talk to me about gender issues in class. During the Pledge of Allegiance, someone says to him—and once again, this is the distinction between the political, where there's a political discourse, and somebody says to him, in particular, America's only for white people. Right? Which is different than we're in class. So we have to put it in context. He's been bullied and banned in the halls, in the cafeteria, in the gym, in the classroom by students and teachers, the locker room, the public area, even the council's area where he was volunteering. In regard to the environment at these schools, we're talking about two different schools, a middle school and then a high school. Is that right? And both these schools are predominantly white, the student population. Is that right? Um, you know, I don't know that. I would assume that there's different parts of— Well, O. Henry Middle School is about 3% black. Isn't that right? The answer is I really don't know that. And our Austin High School is about 3% black. Isn't that right? Is that in the complaint? No. Is that something we can judicially notice? I mean, I think if it is, it is. That's okay. I mean, I'm not sure how it affects my claim. You're not saying B.W. was the only white person in school? No. Okay. No. But he was the only Republican that was bullied and harassed because of his race. And that's the issue we have, is that he— Case start-off is one thing, and then next thing we know— Well, you carry a lot of smorgasbord in your complaint. I mean, you notably say he's named after some African-American, you know, his best friend is Jewish, and a whole lot of other stuff in here. It's not clear from the complaint who the speakers are. D.K. is supposedly his best friend. Is he white or black, or you don't know the answer to that either? Well, D.K. was the class president. All right. We have the class president. My question is, do you know the race of D.K.? No, but I guess we save all that for the motion for summary. So you don't know the answer. Is that your answer? You don't know? We don't know right now. Counsel, even assuming that this school is overwhelmingly white, I assume you agree that white people can be racists. Of course. Of course. The issue, once again—we'll pick it up later, of course— is we live in a divisive time. But the one thing that—you know what I do, right? One thing that's not divisive— everybody wants their kids to go to school in the morning, safe, and come home at the end of the day safe, regardless of their race, regardless of their religion, regardless of their gender, regardless of anything. And this case is important not just only because it's about B.W., because he was a Republican, because he was a Trump supporter. It's important because we want all our kids to be safe when they go to school. Do I understand correctly there are eight separate incidents— Say that again, Your Honor. Do I understand correctly there are eight separate incidents alleged in the complaint— Yeah, there's about— There's about 20 different incidents I counted up. Eleven from teachers and seven from students. But once again— How many involved in explicitly racial reference? I see eight, but is that the right number? I had 18 between both. Somewhere between eight and 18. And once again—but you see, once again, I don't think we want to get fooled by this issue of incidents. He was called racist and bullied and harassed every day, multiple times a day. So it's not—you know, if you want to start talking about incidents, we can have like hundreds of incidents. Well, but the complaint pleads that most of those incidents are political. No, that's not correct, Your Honor. The complaint very, very specifically says they were racist. Okay, counsel, you've saved some time for rebuttal. Thank you so, so much. Good morning, Your Honors. May it please the Court, my name is Chris Gilbert, and together with Stephanie Hamm, we have the honor to represent the Austin Independent School District. This has always been a case in search of a legal theory, and until very late in the pleading stage, this was not a case about race.    and until very late in the pleading stage, this was not a case about race. Counsel, he was allowed to amend his complaint to add, let's assume you're right, add allegations of racial— I think he asked for uninterrupted time. Oh, sorry. I did, but that's okay. I'm not going to use 15 minutes. I just wanted to make some statements at the beginning. B.W. began this case primarily as a First Amendment case, and the case was based on the premise that it was a conservative student in a liberal school district that was being bullied and harassed by his teachers and his fellow students based on his political beliefs. There was no race discrimination claim in this case until the Third and the Fourth Amendment complaint after he changed attorneys. But even then, he didn't change the facts that he was pleading, and the facts still point to politics, not to race. He pled repeatedly and unequivocally that he was mistreated by teachers and classmates because of his conservative political views, predominantly his support for President Trump. He pled more than that. I mean, if we set all that aside, there are some direct statements by school employees that called him whiny, said, I don't want a white man speaking to me about gender. He did plead more than that. But I think you have to look at, when you're looking at a Title VI harassment claim under Davis, which would be Fennel v. Marion ISD held at Davis, the Title IX claim for student-on-student harassment is the proper standard for student-on-student claims for Title VI, you still have to show that it is severe, pervasive, and objectively unreasonable to rise to the level of harassment under Title VI. If you look at Davis itself, Davis talks about how there is gender-oriented conduct that is not enough to rise to the level of harassment for purposes of Title IX. We believe that's exactly what has happened in this case. Yes, there are other allegations in the complaint, but as the panel acknowledged over the course of two and a half years, it was only a handful of comments that were directly related to race by either students or teachers. I think eight is about correct if you look at students and teachers, and if you go back and you look at only teachers, it's basically about three comments that were supposedly made over the course of three years. What if we had a different case? I'm sorry, were we still in the... Until you tell us you've surrendered, I really love hearing the word. I apologize. Okay, I'll go back and make my comments and then I'll let you know. So, again, the court in Fennel v. Marion said that with regards to student-on-student race harassment, it is essential to show that the harassment was based on race, not based on something else. Here, B.W. is trying to conflate all of his political allegations with a very few number of race allegations to make out a claim, but we know that politics and race are different things. We know this because it's obvious that both African Americans and Hispanics can be Republicans and vice versa. There's nothing wrong with that. If you look at the data from the 2020 presidential election, there was something like 10 to 12 percent of African Americans who supported President Trump. And it was about a third of the Asian voters and a third of the Hispanic voters also voted for President Trump. So to say that race and politics are unequivocally aligned is simply not true. Somebody, I believe it may have been Judge Ho, asked what the other side's best case was on the issue of the number of incidents that would rise to the level of severe, pervasive, and harassment. The plaintiff has never cited a case that has combined race and politics. And I don't think there are any that have said that you can automatically take political allegations and use those to conflate your race allegations. There are a number of cases that have held opposite. And our three best cases on this, which admittedly, they are district court cases from other parts of the country, but they directly address this issue. B.S. versus Rochester City School District, Doe versus Abington Friends Schools, and the C.U. Yang versus Ardizone, all of which are 12B6 cases. B.S. was a case in which a third grade student, they were doing a mock trial in her class. And she told her class she was going to vote for President Trump. Every other student said they were going to vote for Hillary Clinton. And that led to a three-year bullying campaign by both teachers and students against that student, during which they repeatedly called her a racist. She was even physically assaulted at one point by one of the ringleaders in the bullying campaign. And the court in that case explicitly rejected the Title VII claim and said taking the allegations in plaintiff's complaint is true. As a threshold matter, plaintiffs have not adequately pled that the alleged harassment faced by Plaintiff D.S. was discriminatorily race-based and driven by the fact that she is white. Instead, plaintiffs repeatedly contend throughout their complaint that the bullying and harassment suffered by Plaintiff D.S. was in response to and driven by plaintiffs' perceived beliefs about race and their preferred presidential candidate. Doe versus Abington Schools was another similar case. You had an eighth grade student who had a party, and at that party, somebody, not Doe, but another student, sang a song that had the N word. For whatever reason, that made students mad at Doe, and they entered into a long bullying campaign against her. They even created a meme about her that said racist that was distributed among all the students. And again, the court rejected that as the grounds for a Title VI claim because they said this is about being called a racist and not about race itself. And I think that that's one of the key deficiencies in the case here when Mr. Serkeel says that this happened daily. When you look at the complaint, most of what's alleged to have happened daily was being called a racist. But there are a number of cases that have held that being called a racist is not itself race discrimination against that person. Both D.S. and Doe versus Abington Friends School held such. Letta versus St. John Newman Regional Academy. The court said race and racism are not concepts that are inextricably intertwined. Simply put, people of all races may harbor racist beliefs. Therefore, being identified as a racist does not necessarily carry with it some identification of a person's race. And there are a number of other cases in there. I think in this case, one of the things that the school district also had to be concerned about when it was looking at what should it do about this is the fact that a lot of the alleged harassment that was going on was itself speech on issues by students of liberal viewpoints that that speech would have itself been protected by the First Amendment. Things like the statement about the evil of the white race in American history. The statement that was actually made supposedly during the Pledge of Allegiance that the flag was only for white people. Those are all statements that themselves may be protected by the First Amendment. And that's a tricky issue for school districts to deal with. When do you protect speech that's hateful? When does it constitute harassment? I think you can focus on whether the speech targets the individual or whether it's about an issue. I think that's a good line that can be drawn. And here at least, the panel and the magistrate judge noticed that these were more statements being made in his presence about race-related issues than they were statements being made at or about BW. I think the conclusion of BW's brief portrays what this case is really about. It wasn't my public policy section. It was Mr. Zerkeel's public policy section in his brief that actually talks, goes right back to discussing politics and complaining about the demonization of those who have a different belief than ourselves. And then concluding that I am more than a little bit frightened in what our next presidential election may entail. The district regrets what happened to BW. But it wasn't race discrimination. It wasn't racial harassment. And after abandoning the First Amendment claim, there are no longer grounds for liability. I'm not saying there was under the First Amendment, but it was a little bit more understandable. I don't think there are any grounds anymore for liability on the part of the school district. I will now take questions from the court. What's the demographics of Austin High School? I don't know. It wasn't pled in the I would expect, somebody said, and I agree, it has a very low African American population. It has a fairly large Hispanic population. A very large Hispanic white minority. That would be correct. I would expect that the Hispanic population You're agreeing that white is in the minority at Austin High School? Yes. Alright. What about O. Henry Miller? You mean white non-Hispanic? I mean white non-Hispanic. Oh, alright. That's true. I mean white non-Hispanic would be in the minority. I don't know about O. Henry Middle School. When he got kicked down to the ground and his nose was bloodied and some kid said it was because he was white, would that be actionable alone under Title VI? It might be if the school district had known about it. But there are no allegations. Again, it was apparently a rumor going around that the student was saying. Well, according to the complaint, you know, the parents were complaining constantly. And you don't think they would complain when their kid got kicked down and not senseless for a few seconds? I do think the parents complained about it. They didn't say it was about race, though. And what makes this case different than a lot of others? In a lot of cases, you know, you have something that happens and a school district or an employer says, we did this because of X. And then the plaintiff says, no, it's discriminatory. It's because of race. But isn't that what you bring out on summary judgment after a few depositions? I don't think in many cases, yes. If there was a vacuum. If after you sort of say, okay, we're not going to believe what the school district said. We're not going to believe that it's discrimination. What are we left to believe? What would the school have done if the teachers were referring to one of the or mix? Or I don't know those. I don't even know precisely what those pejoratives are. Talking to a black kid is blackie. Hey, blackie. I think they would have disciplined them. One thing I think it's important to remember in this case is we did not move to dismiss on the grounds of deliberate indifference. You know, the complaint says that we didn't do anything about this. I think the evidence would eventually show the school district did a lot more to investigate and discipline and things like that. So under the student code of conduct, going back to the IL incident, that's the assault on him. You could discipline that as an assault. That would probably be a more significant penalty because that would be an automatic DAP placement of the education code than it would be as an aspect of race discrimination. So you're saying the complaint is set sufficient for deliberate indifference. You didn't move for dismissal on that basis. That's correct. I think generally speaking, deliberate indifference is not an issue that's probably adequate for a 12B6. Is there a predominance requirement that the complaint has to be about more racism than political criticism? Is there any kind of requirement under the law that you have to pick one or that there has to be a predominance? If it's more politics than race, then we say it's political. Is there any sort of requirement like that in 12B6 law? No. In fact, aren't we supposed to construe the complaint in the favor of the plaintiff and take all the inferences in their favor? And if you have some, you could have some of one and some of the other, and some would be actionable and some would not be actionable. Yes, but what I think makes this case different is that in this case, the plaintiff can give other reasons. But you can give other reasons that are not actionable in your complaint. For example, in the Sewell case, you're familiar with the Sewell case, the major 12B6 case in the circuit. They had two reasons that the young man was discriminated against. And the court specifically didn't determine whether or not it was because he was a young man or anything like that or whether it was because he was black. But they didn't both even have to be actionable characteristics. We have a number of cases from circuits, don't we, that say if you have age and sex, that some might be actionable under one statute and not another, but you don't discount the one that is actionable just because there are allegations under something that might not be actionable. To answer, I think you had a couple questions in there. To answer the first one, yes, Sewell was an intersectionality case. But in that case, both of the grounds that the student argued were both illegal. One was, he argued... Right, but they didn't have to be. I think they did. I think they did for it to rise to the level of discrimination or harassment under that case. If we were to hold that, wouldn't that make us in circuit conflict with other circuits, such as the Tenth Circuit, that specifically recognized intersectionality claims and says that you don't have to have them all be actionable under the particular statute at issue? Yes. What I meant was, in Sewell you could look at more factual allegations because he was saying, I'm being discriminated against because of my race. Sewell was a hairstyle case, largely. I'm being discriminated against because of my gender, and it's because of my race and my gender. So, more of the factual allegations were related to legal causes of action. Here, you have allegations that don't go to a cause of action, or at least one that wasn't kept in the case. If somebody is victim of viewpoint discrimination and racial discrimination, are they a victim of racial discrimination? If they're... I'm sorry, I'm not understanding... You said if they're a victim of racial discrimination. This is hypothetical. If somebody is a victim of political viewpoint discrimination and racial discrimination, are they a victim of racial discrimination? Well, your question presupposed that they were a victim of racial discrimination, so yes. Without knowing the facts and what the allegations are, I can't really answer that. If someone pleads that they are a victim of viewpoint discrimination, and they also plead that they are a victim of racial discrimination, have they pleaded racial discrimination to survive 12B6 since there's no predominance requirement? No. What case says that? Iqbal and Twombly, which say you have to plead the facts. Pleading I am a victim of racial discrimination is a legal conclusion. No, but you're fighting the hypo. They plead facts to establish they were a victim of racial discrimination in the hypo. The hypo is they plead racial discrimination and they also plead viewpoint discrimination. If they plead enough facts to make out a claim of racial discrimination, then yes. It doesn't matter that they've also plead something inactionable under the statute. No, it wouldn't, but in this case they have not... If we took out the politics from this complaint, it would be a really short complaint, wouldn't it? Yes. And the question is would we have severe pervasive and objectionable offensiveness if we took out all of the politics, all of the stuff about his Second Amendment arguments and so on and just looked at where somebody called him white? It would be a very short complaint and would it be severe and pervasive? Correct. Counsel, let's test that proposition. Here's a hypo. Let's say a black student is in a public school and shows up to school one day wearing an Obama for President hat. Faculty and students begin to treat that student poorly. When the parents complain, a counselor responds that, well, the Obama hat was pretty inflammatory. Later, students make fun of the student for wearing the Obama hat and lecture him about the evils of the black race in American history. A middle school principal yanks out the earbuds from this student and says, are you listening to hip-hop? A teacher says to the students, man, I'm getting concerned about how many black people there are. An aide in the math class repeatedly calls the student a thug and says things like, can't figure this one out, thug? Now, I could keep going. I'm just reading from the complaint and replacing the white racism with anti-black racism. So is it your position that a complaint that alleged those things by a black student is not, shouldn't get past 12B6 in a Title 6 case? If that was all they pled, it might get by 12B6. What makes this case different is the fact, because what you didn't read were all the political allegations. And there's an allegation that says, wow, so you want the welfare state, or, wow, you must really like Obamacare, you must really want rationing and health care. If I add those allegations in, all of a sudden it's not a Title 6 complaint? I think in that case it could be. I think in this case, you don't have to trust me that it wasn't about race. The parents themselves and the student, as somebody pointed out, complained a lot to the school district. They never complained about racism. You're looking at three years. I mean, I do not think anybody should be a racist about any race. So please understand that. So I totally do not want to call anybody, you're this, you're that, and I think it's very improper. But the question is whether it's a Title 6, not whether it's unethical or improper or something you don't want your kid to have. And so getting back to this, we're talking about three years and just little flakes, whereas there's boom, boom, boom, boom on the MAGA hat, the Second Amendment, and so forth. I mean, does that matter at the 12B6? Absolutely, because it goes to the issue of pervasiveness at least, and I don't think in this case it gets to that point. How many allegations do you need? Is eight enough? Pervasiveness, I think, is not just an issue of how many allegations, but over the course of time. Eight over the course of two and a half years? No, I don't think that would be enough. Even when the principal yanks? And at two different schools? Is that also correct? Or did all eight happen at one school? They happened at two different schools. The first year was at his freshman and sophomore year of high school. The panel mostly cited Fennell and Sewell, correct? Correct. And those two cases were daily incidents? They were daily incidents. And Sewell, which is the Thug case, if I remember, that case involved allegations that all black males had hairstyles that were inappropriate. My question for you is, in this complaint, how many, did BW allege that any other white students were ever harassed for being white? No. That's a big distinction from Sewell. I think that's a significant distinction from Sewell. So it was only the Republican white that was ever called by his skin color? That's the only allegation in the lawsuit, correct. But again, I would go back, Sewell, I think... So only the Obama hat wearer, if that's the only person under Judge Duncan's hypothetical, that's the only African American victim is the Obama hat wearer. That somehow changes the racial discrimination? No, I don't think it would change the racial discrimination. In other words, a community can be racist towards one person, even though there are other members of that person's race present as well, right? That's correct. So I have the complaint right here for Sewell. Sewell is not a community. It's the same kind of things. It says it was a saga. It says a particular incident, and it says this continued. You said, oh, well, there would be a much longer complaint or a better complaint. Have you looked at the Sewell complaint lately? With all due respect, I didn't say that it would be a much longer complaint. Or better complaint. It's the same kind of thing that says there were daily incidents. There are problems. There's a saga. You're giving the benefit of the doubt to the plaintiff in one case about the daily incidents being on point, and you're specifically discounting the daily incidents as being not on point when you're not supposed to do that under Iqbal and Twombly. You're supposed to give the benefit to the extent it's ambiguous to the plaintiff. This is not a plausibility case like moon is made of green cheese, is it? You're not saying that people couldn't be discriminated based upon being white, even in a white school, are you? No. But I think the difference here, and the point I was trying to make about Sewell before was, unlike in this case, Sewell had no other reason. The only allegations were that there was an illegal motive. It was either race or it was gender or it was a combination of the both. And according to the complaint, everything was tied to the original statement. They called him gay. They called him gay because he was dyeing his hair and they said that the women could dye their hair but not the men. There's certainly a lot of overlap with different kinds of claims. It was treated as a racial claim but it also had other things percolating all through the complaint and through the facts. Sewell was also more of a teacher on student harassment case than it was a student harassment. Daily harassment supposedly came from the teacher. But again, what I think is different is here where they say there was daily harassment and bullying going on, it appears to be that it was political or it was being called racist. That's the thing. It doesn't say it was daily political harassment and bullying. You've just taken it that way. I take all of the specific political allegations that are made and there are a lot of them. And they are almost all political. And then, again, you don't have to take my word at it. Go back and see what the parents complained about because the parents, as I said, complained repeatedly. They never told the school that they thought it was about race. I just have a little question about that, Mr. Gilbert. Maybe the parents were I don't know who did the harassment. If it's a minority Anglo school, it's minority Anglo school. So let's assume arguendo that the harassers were in the majority which might mean Hispanic. Maybe the parents were scared to say these kids are roughing up our son because they're Hispanic and he's white. They could well have been scared because you already have the teachers calling him whitey, the principal being tone deaf. If they had said that, that would have squarely raised the race charge against them, wouldn't it? I do think in some schools the parents might have been scared to come forward and make these complaints. I think if you look at the allegations that are made in this case. I mean, and make the complaints that said this is racism. It's not just political they might have thought was something they could sell the administration but God forbid that they should say the little white kid is being beat up by a minority. I don't believe that that's, with all due respect, I don't believe that that's a plausible allegation. We don't have anything on the record to show that he was beat up by a minority, do we? Is there anything in the record that says he was beat up by a minority? No, the races of the students who did the beating up. I don't believe that's a plausible allegation. Does it matter who beat, what color of the skin it was of the person who beat him up? If the person said they did it because he was white? An allegation that was never made to the school district. This is, that's what I'm saying. This could have been a motivation why the parents, that one could draw as an inference from the fact that the parents were scared to say anything. Okay, but how is the school supposed to imply who beat him up or anything? Yeah, but how is the school supposed to address racism if they're not told about it? And under the Spendings Clause, we have to have, right, because under the Spending Clause, Davis and Gebser, we have to have noticed that it's actually illegal discrimination before that contract kicks in that would create us to be liable. To call anybody by a racial name, whitey, blacky, browny, yellowy, is per se questionable. Is it not? I agree, I agree that that was inexcusable. That was one aide in one class and we don't know how many times it happened over the course of two and a half years. But he says repeatedly. He says repeatedly that he was harassed and bullied, but again, he doesn't link that to anything. When he does link it to anything, it's to being called a racist. Well, why shouldn't he do a Fifth Amendment complaint then? If he, if it's not, if it's that he's not specific enough, then why doesn't he have a right to do a Fifth Amendment complaint? They did not ask for permission to file another complaint. Because they thought it was adequate. And you're saying that, well, they needed to say exactly when the repeatedly happened. To be honest, at the time we were briefing this, this case was not about race. It was about First Amendment and Monell liability. If you go back and you look at all the pleadings at the motion to dismiss stage, that's what all the time was spent on, on arguing. I think it's a danger to view this as a mixed motives case. That's a doctrine that applies intersectional discrimination case. I, there is no, there's no good standard. There's no good case. I actually spent two hours last night trying to find a case that would give me a number. I couldn't find one. Why are we talking about intersectionality, which is a fashionable buzzword? It's not in the statute. No, it was not in the state. The statute just says racist. No, I agree. My fundamental problem with this is making this hermetic distinction between politics and race. A comment directed towards someone could be both. I don't see why that's not obvious. If this court were to hold that, you would be the first court to hold that. Let the jury decide. And I think, but again, I think what makes this different and the other cases that have looked at the issue of politics versus race have said they are different. And again, I do think if you went back and you looked, I think you, there might be facts that would lead to a plausible information that somebody was using political statements as a cover for race. That's not the case in this. If you chart out the speakers and what they said, the people who made the racist statements are not alleged to have made political statements and vice versa. So you can't, you can't say, oh, you know, Jim Bob said something political, but he also said something racial so we know what this really meant. That doesn't happen in the facts in this case when you go through and you look at them. I see I'm out of time. We would ask you to affirm the decision of the panel. Thank you. Just a few small points to get started in the case law that counsel mentioned. He cites in their brief on a number of pages, the case DS versus Rochester School District. I can point out that the  asterisk 30 and 36, the case DS, I quote, none of the allegations in the complaint alleged that plaintiff DS was called names or assaulted with any reference to her race. None? None. So to the extent the court, well, the school district is relying upon that case, I actually think it helps us. Then another point we haven't really spent a lot on, the little bit further in the DS case that the court there thought important was that the plaintiff remained in school during this entire period that she was being bullied. Why that's important deals with a part of the case that deals with the deprivation of equal access to educational opportunity and what the Davis case told us about how do we know what's an indicator when there's a child who has been deprived of that equal access. Well, here we have, which is in accord with Davis, that he had failing grades, he didn't eat well, he didn't sleep well, he got depressed. He ended up failing the STAR test even though he had been a good student. He ended up not going back to school. So the DS case actually helps us. Counsel also talked about the Abington case and there at asterisk 19, they point out that there was only one allegation in that case that had anything to do with race. Only one. And of course in our case we have significantly more. Then there was another case that they cited, the Siu-Yang v. Ardozzoni case and there the court notes that there was actually no facts that the person presented that he was discriminated based upon race. So I think in terms of case law, they don't have anything that really helps them, I believe. Just a couple of points there. We were before the court about a year or two and another case with AISD was the Snead case with an African American girl who was bullied and harassed horrifically. I found that a horrible case. But one thing, and we went to trial there with Judge Acol during the pandemic, so it was just before him and we lost on deliberate indifference. But what was very interesting about that case and I would submit to the court that we could look at that and I have the site from the district court which is 490 FSUP 3D 1069 and what's important there is that that court went through in detail the distinction between allegations of things related to race and things that weren't. So the point being that yes, we have different allegations that can occur at the same time. In this case, politics. In the Snead case, it was other things. But the point being that courts are well adapted at picking and choosing and able to take which one's race, which one's politics, which one's religion and that's all the same that can and should be done in this case as well. Do you agree with Mr. Gilbert's inference or comment that in the complaint, some of the people who are bullying your plaintiff because of politics are not the same people who were bullying him because of race? Well, that may be true, but once again, the issue in a hostile educational environment In that case then, do we have to disaggregate the complaint according to who the alleged speaker was? Well, I think when we talk about totality of the circumstances pursuant to the Davis case, then the answer is that's also . . . sometimes we have either or, sometimes we have and also. So within a certain context, I think we have to look at everything and then we have to balance them out. So the answer is yes, we would have to disaggregate that, but then we also have to look at it again as compared to or in relation to everything else around it. I want to talk a bit about the Sewell case and the Fennell cases, by the way. So Fennell was a seminal case here in the Fifth Circuit that dealt with race-based discrimination. And what was telling in that case when the panel wrote, and I think that case may have gone in bunk too, I forget right now, but one of the things that we're telling that one teacher had made fun of the child's hair and then another teacher had made a comment about black people being on welfare, kind of a stereotypical thing that they threw out. And the court found that very important. In the Sewell case, even more so, what the case might have turned on was the fact that the dean of students was the one that was insulting the child about his race. And here we have a number of teachers, including the principal, that brought up race-based discussions in court in front of all the other, in the classroom, in front of all the other students. So I want you to think about that. If the teachers are making fun of the kid because he's white and they're calling him whitey, or we don't want white people to talk about this, how does that affect the other students? What it does, it gives them license to do more. It gives them license to be worse. I don't know if we're going to win this case, I don't know if we're going to lose this case, I don't know if we're going to draw on this case, but I implore that when someone writes this decision up, I think the teachers need to be reprimanded. The one thing, kids are kids, and the teachers are teachers. And I'm not going to joke with my clients. You want your kids to do stupid things when they're young, not when they're 30 or 40. So it's okay. But we need to make sure that the people who teach our children are neutral. They have to be. It's difficult times. And we know we have a new election coming upon us that's going to be even more difficult. And it's divisive. But I want to finish up the way I started. For all of us parents, grandparents, neighbors, uncles, aunts, when we send our kids to school in the morning, we want them to come home safe. And we certainly expect them to get a fair shake from the teachers that did before. If there's any other further questions, I'm happy to take them. Thank you, counsel. The court will stand adjourned until 9 o'clock in the morning. Thank you.